IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 2, 2021 Session

## STATE OF TENNESSEE v. QUINCY LAMONT COLLINS

**Appeal from the Circuit Court for Madison County**
No. 20-67     Roy B. Morgan, Jr., Judge
_____

### No. W2020-01566-CCA-R3-CD
_____

Defendant, Quincy Lamont Collins, was indicted by the Madison County Grand Jury for one count each of attempted first degree premeditated murder, aggravated assault, especially aggravated robbery, employing a firearm during the commission of a dangerous felony, being a convicted felon in possession of a firearm, and employing a firearm during the commission of a dangerous felony having been previously convicted of a dangerous felony. Following a jury trial, Defendant was convicted as charged, and he received an effective sentence of 31 years. In this appeal as of right, Defendant contends that the trial court erred by denying his motion to suppress his statement to police; that the trial court should have suppressed the gun located as a result of information obtained during Defendant's interrogation; that the trial court erred by instructing the jury on flight; and that his convictions for attempted first degree premeditated murder and aggravated assault violate double jeopardy. Following our careful review of the record, the arguments of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and NORMA MCGEE OGLE, J., joined.

M. Todd Ridley, Assistant Public Defender, Appellate Division, Franklin, Tennessee (on appeal); Jeremy Epperson, Jackson, Tennessee (at trial) for the appellant, Quincy Lamont Collins.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Bradley Champine, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

On September 9, 2019, an arrest warrant was issued alleging that Defendant shot in the chin and upper chest the victim, Jessica Graves. Defendant had been involved in a relationship with the victim. Defendant turned himself in to police and gave a statement to Jackson Police Department ("JPD") Sergeant Nick Donald on September 10.

## *Motion to Suppress*

Defendant filed a pretrial motion to suppress his statement to police, arguing that he asserted his rights to remain silent and to have an attorney present and that he was coerced into providing a statement by promises of leniency. The State filed a response.

A recording of Defendant's police interview was the only evidence introduced at the suppression hearing. The interview lasted approximately one hour and twenty minutes. Defendant entered the interview room wearing leg shackles and handcuffs. Defendant's leg shackles were removed and he was given a bottle of water. Sergeant Donald entered the room five minutes after Defendant, and he removed Defendant's handcuffs.

Defendant stated that he was not under the influence of any drugs or alcohol and that he was able to read and write. Sergeant Donald read Defendant his *Miranda* rights and asked if he understood his rights. The following exchange occurred:

> Defendant: Yeah, I understand that, but I don't agree with it, 'cause I don't know what you're talking about. So I ain't going to say I don't want no lawyer at this time, but I'll listen to you, though. But I ain't going to answer your questions.
>
> Sergeant Donald: Do you understand? I'm not saying you have to give a statement.
>
> Defendant: Oh, okay. No, you read it all.
>
> Sergeant Donald: Do you understand this [form]?
>
> Defendant: I understand what you're saying.
>
> Sergeant Donald: I'm not saying you have to give me a statement.
>
> Defendant: Oh, okay.

- 2 -

Sergeant Donald: I'm just saying, do you understand your rights?

Defendant: Mmm hmmm.

Sergeant Donald: Okay. That's all this is saying.

Sergeant Donald: I'm not trying to get you to sign no statement. This is, like I said, is your rights. That's what this form is saying. I'm going to put the date and time and everything on here that I read you this and have you sign it and I'll sign it and we understand it, and we can move on.

Defendant then signed the form. Sergeant Donald confronted Defendant with Ms. Graves' allegation that Defendant shot her. Defendant told Sergeant Donald that he was at work on the night Ms. Graves was shot. He explained that he went to his car to get his cigarettes but returned right away. He denied that he went to Ms. Graves' apartment that night. Sergeant Donald again told Defendant that Ms. Graves said Defendant shot her. Sergeant Donald told Defendant that Ms. Graves made a police report three days prior to the shooting that Defendant had threatened to shoot her. Defendant told Sergeant Donald, "We were playing with each other when she said that, so she just doing all this lying. I don't want to talk about dat [that] no more." Sergeant Donald then asked Defendant who he thought shot Ms. Graves, and Defendant responded, "I don't know and I don't care."

Sergeant Donald commented on Defendant's lack of remorse, stating: "When a person doesn't show any kind of remorse, or anything like that, it will go into how people look at you, how you're perceived. . . . That's just my look on it, my experience with it." Defendant then stated:

> I need a lawyer. I ain't going to show you no – I can't sit here and show you no remorse and keep talking, and you putting this on me. I need a lawyer then, is what it sounds like. I ain't no damn dummy either, keep talking to you. . . . So I just ask you what this is, like, what you fixin' to charge me with?

Sergeant Donald responded that Defendant was being charged with attempted murder. Defendant asked Sergeant Donald what he thought he would "get out of attempted murder," and Sergeant Donald told him that the judge would make that decision. Defendant then began to talk about his treatment in jail. He said that he had been "treated like s**t," that he had asked for "PC," or protective custody, and that a man who shot him in the back was also at the jail. Defendant continued to speak about remorse and whether he had remorse and then told Sergeant Donald, "Don't nobody know what the f**k happened 'cause it was something somebody else said." Sergeant Donald then asked

- 3 -

Defendant, "What do you think happened?" Defendant said he did not know because he was at work and he doubted that his supervisor saw him leave. Sergeant Donald told Defendant that police "did this all the time" and that people who do not "even acknowledge what they did or have remorse, then they tend to be given a stricter punishment."

A short time later, Defendant asked, "Okay, I do want to ask you all, before we [unintelligible], are we through with this? 'Cause y'all are lying and I [unintelligible] and I gotta find out about a lawyer." Defendant then complained again about his treatment in jail and said that he felt like his life was in danger there. Sergeant Donald told Defendant that he would see if he could get Defendant moved.

Without any prompting by Sergeant Donald, Defendant then returned to the subject of the allegations against him and said, "dude don't work that shift" about a co-worker who said he saw Defendant leave work. Sergeant Donald told Defendant, "I'm not calling you a liar or anything like that." He told Defendant that he would "listen without judging" if Defendant wanted "to elaborate and explain some things." Then the following exchange occurred:

> Defendant: I really wanted to come in here and have a lawyer talk to y'all. I really didn't want to say s**t to y'all.
>
> Sergeant Donald: Okay. That's your choice, and I respect that, so.
>
> Defendant: No, I want to tell you for real. I really didn't want to say nothing to y'all.
>
> Sergeant Donald: Okay, well.
>
> Defendant: I'm mad though.
>
> Sergeant Donald: At the situation?
>
> Defendant: No . . . I'm mad 'cause I came up here f**king yesterday and I could have died somewhere else.

Defendant told Sergeant Donald that his "life [was] gone" because police were "blaming this" on him. Defendant again told Sergeant Donald that his supervisor did not see him leave work. Sergeant Donald then told Defendant that Ms. Graves said Defendant shot her. Defendant told Sergeant Donald that people "put a lot of s**t" on him that he did not know how to "clear up." Sergeant Donald informed Defendant that he would meet with the district attorney and present the evidence police had and they would "take it from

- 4 -

there." Defendant began another discussion about his treatment in the jail. Sergeant Donald told him he would "get [him] a ride in a minute" and "meet [him] outside to smoke."

Sergeant Donald left the room and Defendant turned off the lights and adjusted the video camera. Sergeant Donald returned to the room approximately seven minutes later and gave Defendant a cigarette. While Defendant smoked the cigarette, he told Sergeant Donald that he had been suicidal and that he had been treated poorly by "the system" for 20 years. He told Sergeant Donald that he "laid in the f**king bushes" all day Saturday and gestured like he was pointing a gun to his head. He said that he changed his mind because he loved his children and wanted to spend one last night with them.

Defendant eventually told Sergeant Donald that he turned himself in because he loved Ms. Graves and he "didn't mean to do it." He said that he called Ms. Graves at 1:00 a.m. to ask if he could come to her apartment. She let him inside, and he went to sleep on her couch. He stated that Ms. Graves woke him up and told him to go back to work. Ms. Graves was sitting in her bed, and he had his gun to his head. Defendant said Ms. Graves reached for her gun and he shot her. He said that she jumped over to where her gun was, and he fired again. Defendant said "he ain't mean to" because he only intended to do what he "always said" about committing suicide. Defendant said that he took Ms. Graves phone, gun, and purse and that he thought Ms. Graves was dead. When he saw on the news that she lived, he "was proud of her."

Sergeant Donald asked Defendant where he put his gun, and Defendant told him that he got rid of it. He said that he did not want to reveal where he put his gun because it would get him in more trouble. Defendant eventually told Sergeant Donald that he threw the gun in the woods near a cemetery in Humboldt where his mother was buried. He said that he had searched the woods for seven hours looking for the gun but was only able to find the clip.

In a written order denying Defendant's motion to suppress, the trial court found that Defendant "never clearly and unambiguously asserted his right to cease questioning and have an attorney present" and that "no coercion of the Defendant by any officer took place, and . . . no officer made any express or implied promises of leniency or engaged in any action that could reasonably be construed to overbear the Defendant's free will."

### *Trial*

Jessica Graves, the victim, dated Defendant for one year prior to the incident. She testified that they had broken up in the two weeks prior to September 7, 2019. On that date, at around 1:00 a.m., Ms. Graves awoke to hear Defendant "beating on [her] window

and knocking on [her] door and calling [her] phone[.]" Defendant asked if he could sleep there. Ms. Graves testified that Defendant was "abusive" and "a manipulator." A few days prior to the shooting, Defendant had threatened to shoot Ms. Graves. She testified that she woke up to find Defendant "sitting on the bed," and he said, "'I should shoot you.'" Ms. Graves reported the incident to police, but she did not ask to press charges or obtain an order of protection. She testified, "I never really thought in a million years that he would actually try to kill me." When Defendant arrived at her apartment on the night of the shooting, Ms. Graves thought he was just there to sleep.

Defendant fell asleep on the couch. Ms. Graves woke Defendant at around 5:30 a.m. and told him that it was time for him to leave for work. She then went back to her bedroom to watch TV. She testified,

> I was watching TV, and when I turned my head, he was right in my face, and I just felt something, you know on my arm. It was hot. And I remember falling back on the bed, and I don't remember what he did. I didn't know he shot me in my chin and – or whatever. And I remember looking at him, and he was taking my purse, my car keys and my cellphone, and I had a 9-millimeter, and he was taking all of that. So I closed my eyes and acted like I was dead and waited until I heard him close the door, and I jumped up and I ran to a bunch of people house until one lady let me in, and I went unconscious after that.

Ebony Cheairs testified that she heard a knock on her door at around 5:00 a.m. When she went to the door, Ms. Graves said, "'I'm your neighbor. Can you please help me? I've been shot.'" Ms. Cheairs pulled Ms. Graves inside and called 9-1-1. Ms. Graves told Ms. Cheairs that her boyfriend had shot her.

JPD Officer Ryan Brisco responded to a call of a "suspicious situation regarding a female knocking on other neighbors' door requesting help." He was flagged down in front of the victim's neighbor's house. When he entered the house, he saw Ms. Graves "laying on the kitchen floor surrounded by a puddle of blood." Officer Brisco testified that Ms. Graves was "in and out of consciousness." He observed two gunshot wounds, one to the victim's chin and one to the victim's shoulder.

JPD Officer Lance Wright responded to Ms. Graves' apartment and observed blood on the kitchen door and "large amounts of blood" leading from the kitchen through the living room and into the bedroom. In Ms. Graves' bedroom, Officer Wright saw "a very large amount of blood on the mattress and the sheets that covered the mattress." He also noticed that "a disturbance had occurred in the bedroom." Officer Wright found two .45

caliber shell casings and a bloodied projectile in the bedroom. Officer Wright photographed the crime scene, and the photographs were admitted into evidence.

Sergeant Donald had an arrest warrant issued for Defendant's arrest on the Monday morning following the shooting. Sergeant Donald interviewed Defendant on September 10, 2019. A video recording of the interview was played for the jury.[1] Sergeant Donald testified that Defendant initially denied having any knowledge about the shooting. He testified that Defendant ultimately admitted that he shot Ms. Graves when she reached for her gun. Defendant also admitted that he took Ms. Graves' purse, keys, phone, and gun. He stated that he thought she was dead and that he took her belongings and his gun to the cemetery in Humboldt where his mother was buried.

Based on Defendant's statement, Sergeant Donald and other officers retrieved Defendant's gun, a .45 caliber handgun, from a wooded area in the cemetery. An examination of the gun revealed that the two shell casings recovered from Ms. Graves bedroom were fired from the gun. Police were not able to locate Ms. Graves' stolen property.

As a result of her injuries, Ms. Graves suffered facial paralysis, limited mobility in her arm, a scar on her chest, and "metal in [her] eye" that caused it to "run[] all the time." Ms. Graves also testified that she was deaf in her left ear and that her injuries were permanent.

After proper inquiry, Defendant waived his right to testify. Defendant offered no additional proof.

Based on the evidence presented at trial, the jury convicted Defendant as charged. The trial court imposed an effective sentence of 31 years' incarceration. Defendant now appeals.

## *Analysis*

### *Motion to Suppress Defendant's Statement*

Defendant contends that the trial court erred by allowing his statement to Detective Donald to be admitted into evidence. He argues that the trial court should have suppressed the statement because he invoked his right to remain silent and his right to counsel during the interview. The State responds that Defendant did not unambiguously and

---

[1] Portions of the recording were redacted by agreement between the parties.

unequivocally invoke his right to remain silent or his right to counsel and that even if the trial court erred by admitting the statement into evidence, any such error was harmless.

Both the state and federal constitutions guarantee an accused the right to the assistance of counsel and the right against self-incrimination. The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Tennessee Constitution similarly provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and to remain silent may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). However, during the course of an interrogation, if the defendant clearly and unequivocally invokes either his right to silence or his right to counsel, the interrogation must immediately cease. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *Davis v. United States*, 512 U.S. 452, 459 (1994). "The fundamental purpose of the Court's decision in *Miranda* was 'to assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process.'" *Connecticut v. Barrett*, 479 U.S. 523, 528 (1987) (emphasis omitted) (quoting *Miranda*, 384 U.S. at 469).

Defendant acknowledges that he voluntarily waived his *Miranda* rights. He argues, however, that he invoked his rights to remain silent and to counsel and that Sergeant Donald did not scrupulously honor his rights by immediately ceasing the interrogation. Once a suspect unequivocally invokes his right against self-incrimination, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (quoting *Miranda*, 384 U.S. at 474, 479). If an accused makes an unequivocal request for an attorney, all interrogation must cease "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis* , 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)); *see also State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," questioning need not cease, nor must an officer clarify the suspect's intention

regarding invocation of the right to counsel. *Davis*, 512 U.S. at 459, 459 (emphasis in original).

"Whether an individual's request for counsel is equivocal or unequivocal is a mixed question of law and fact that is ultimately subject to de novo review." *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013). Our review of the question in this appeal is entirely de novo, with no deference to the trial court's factual findings, because the trial court's factual determinations were based upon the video recording of Defendant's interrogation, which is included in the record on appeal. *See id.* (citing *State v. Turner*, 305 S.W.3d 508, 514 (Tenn. 2010) (applying de novo review because the trial court's determination was based on video evidence included in the appellate record). Finally, a conviction may be affirmed, notwithstanding a nonstructural constitutional error, if the State proves beyond a reasonable doubt that the error "did not contribute to the verdict obtained." *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) (internal quotation marks omitted).

Turning to the interrogation in this case, Defendant asserts that he invoked his right to remain silent when he told Sergeant Donald, "I don't want to talk about this no more." The State makes the clear distinction, however, that Defendant actually said, "I don't want to talk about dat [that] no more," which the State asserts was made in reference to Ms. Graves' having reported to the police that Defendant threatened to shoot her three days prior to the shooting. The State notes that Defendant was "clearly annoyed" by the allegation that Ms. Graves had interpreted their conversation as a threat and reported it to police. Defendant told Sergeant Donald that they had been playing around and that Ms. Graves was "just doing all this lying." Defendant then told Sergeant Donald that he did not want to talk "about dat" anymore.

We agree with the State in this instance that Defendant did not indicate a desire to cease speaking altogether. Rather, Defendant's statement that he did not want to talk about "dat" or "that" anymore indicated Defendant's desire to terminate the discussion of a particular subject. *See State v. Nathan Bernard Lalone*, No. E2016-00439-CCA-R3-CD, 2017 WL 2297653, at *12 (Tenn. Crim. App. May 25, 2017) ("[G]enerally statements have not been found to be a clear and unambiguous invocation of the right to remain silent when they . . . 'indicate only the suspect's desire to avoid answering a particular question or to avoid speaking about particular themes[.]'"), *no perm. app. filed* (citing *State v. Rogers*, 760 N.W.2d 35, 58-60 (Neb. 2009)). We conclude that Defendant's declaration that he "didn't want to talk about dat no more" was not a clear and unequivocal expression that he wished to remain silent.

Defendant asserts that he expressed a desire for counsel on five occasions during the interview. He concedes that two of the five requests "may have been somewhat equivocal." Defendant asserts that he "expressed reluctance about proceeding without an

attorney" when he told Sergeant Donald, "Yeah, I understand [the waiver form], but I don't agree with it, 'cause I don't know what you're talking about, so I ain't gonna say I don't want no lawyer at this time, but I'll listen to you." Defendant also acknowledges that he equivocated in his statement, "I really wanted to come in here and have a lawyer talk to y'all."

Defendant contends, however, that he unequivocally and unambiguously invoked his right to counsel on three other occasions. He asserts that he invoked his right to counsel when he twice said, "I need a lawyer." The State contends that, taken in context, Defendants two statements, "I need a lawyer" were not unambiguous and unequivocal statements that he wanted an attorney present during the interview, but rather an expression that he might need legal counsel at some future time. Defendant extracts the two statements from the following monologue:

> I need a lawyer. I ain't going to show you no – I can't sit here and show you no remorse and keep talking, and you putting this on me. I need a lawyer then, is what it sounds like. I ain't no damn dummy either, keep talking to you. . . . So I just ask you what this is, like, what is you fixin' to charge me with?

The State argues that Defendant's two statements that he "need[ed] a lawyer" were ambiguous because they were qualified by the phrase "is what it sounds like." The State also points out that Defendant continued to talk after he twice stated he needed a lawyer. Defendant asked Sergeant Donald what he was being charged with. Sergeant Donald answered that Defendant was being charged with attempted murder, and Defendant immediately asked what Sergeant Donald thought he would "get out of" that charge. The State argues that Defendant's questions to Sergeant Donald indicated his desire to continue the interview without an attorney present.

First, we agree with the State that the above statements by Defendant do not constitute an unambiguous and unequivocal request for counsel. Whether or not an accused has actually invoked his right to counsel during interrogation is an "objective inquiry." *Davis*, 512 U.S. at 459. "The accused 'must articulate his desire to have counsel present sufficiently clearly that a reasonable [police] officer . . . would understand the statement to be a request for an attorney.'" *State v. Saylor*, 117 S.W.3d 239, 246 (Tenn. 2003) (citing *Huddleston*, 924 S.W.2d at 670). The investigating officers may continue to question an accused if the accused's reference to counsel is ambiguous or equivocal. *Id.*

Defendant's statement, "I need a lawyer then, is what it sounds like" is similar to other statements that this Court has found to be equivocal or ambiguous. *See, e.g., State v. John M. Ake*, No. 01C01-9603-CC-00094, 1997 WL 311908, at *2 (Tenn. Crim. App. June

6, 1997) ("I probably need to get a lawyer, don't I?"), *perm. app. denied* (Tenn. Mar. 9, 1998); *State v. Michael James Bell*, No. E2008-01499-CCA-R3-CD, 2010 WL 3612751, at *24 (Tenn. Crim. App. Sept. 17, 2010) ("I think I need to talk to a lawyer."), *perm. app. denied* (Tenn. Feb. 16, 2011); *State v. Adam Sanders*, No. M2005-02185-CCA-R3-CD, 2006 WL 3516210, at *8 (Tenn. Crim. App. Dec. 6, 2006) ("I guess I need a lawyer, don't I?"), *no perm. app. filed*.

Our supreme court in *Climer* noted that equivocal statements like those in the cases cited above communicate "merely a potential desire to consult with counsel and lack[ ] the clarity and definitiveness characteristic of statements deemed unequivocal invocations of the right to counsel." 400 S.W.3d at 563-64 (citations omitted). Defendant's statement did not clearly communicate his desire for an attorney to be present before questioning continued. Furthermore, even if we deemed the statement to be an unequivocal invocation of the right to counsel, Defendant immediately initiated further communication by asking what charges he was facing. *See, e.g., Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983) (concluding that the defendant's question, "Well, what is going to happen to me now?" evinced "a willingness and desire for a generalized discussion about the case" and "was not merely a necessary inquiry arising out of the incidents of the custodial relationship").

Defendant continued the dialogue with Sergeant Donald. Once a suspect invokes his right to counsel under the Fifth Amendment, he or she "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85. After viewing the video recording of the interview, the trial court observed that Defendant "kept on talking about all kinds of stuff without the officer asking a question. . . . [a]nd [the trial court] noted that throughout the interview." The trial court noted that Defendant "kept on talking constantly" after each of his references to an attorney and that "Defendant's actions were different from what he was saying."

We agree with the trial court's assessment. Immediately after Defendant stated that it sounded like he needed a lawyer, he asked Sergeant Donald about the charges against him and the potential consequences of the charges. Sergeant Donald answered Defendant's questions, telling him that he was being charged with attempted murder and that "the judge makes [a sentencing] decision." As soon as Sergeant Donald answered Defendant, Defendant immediately began complaining about the way he had been treated in jail. He continued speaking to Sergeant Donald for several minutes. By initiating further dialogue, Defendant voluntarily and knowingly waived any invocation of his right to counsel. *See id*.

Defendant also asserts that he invoked both his right to remain silent and his right to counsel when he said, "we through with this . . . I gotta find out about a lawyer." Again,

the State points out that Defendant misrepresents the statement by not putting it in context of the full quote, in which Defendant asked Sergeant Donald: "Okay, I do want to ask you all, before we [unintelligible], are we through with this? 'Cause y'all are lying and I [unintelligible] and I gotta find out about a lawyer." We agree with the State that Defendant did not unequivocally and unambiguously assert his right to remain silent when he asked "are we through with this?" rather than declare, "we through with this," as Defendant asserts on appeal. We further conclude that Defendant's statement, "I gotta find out about a lawyer," was not an unequivocal invocation of his right to have counsel present for the interview.

Based on our review of the video-recorded interrogation, Defendant did not unequivocally and unambiguously invoke his right to counsel or his right to remain silent. Accordingly, the trial court did not err by not suppressing Defendant's statement. Moreover, even if we deemed any of Defendant's references to a lawyer as unambiguous requests for the assistance of counsel and determined that the trial court should have suppressed his statement, the error would be harmless in light of the overwhelming evidence against Defendant.

"The erroneous admission of evidence obtained in violation of a defendant's *Miranda* rights is a non-structural constitutional error, and as such, is subject to . . . harmless error analysis." *Climer*, 400 S.W.3d at 569-70. The State bears the burden of demonstrating beyond a reasonable doubt that a non-structural constitutional error did not contribute to the guilty verdict. *Id*. (citing *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). "An inquiry into harmless error does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct." *Rodriguez*, 254 S.W.3d at 372. The proper inquiry is whether the "error more probably than not had a substantial and injurious impact on the jury's decision-making." *Id*.

Even if Defendant's statement, in which he admitted that he shot Ms. Graves and stole her belongings, had been suppressed, the jury heard the same evidence from Ms. Graves herself. Ms. Graves gave detailed testimony about Defendant's actions on the night of the shooting. She testified that Defendant called her and asked to come inside her apartment, that he slept on the couch until she woke him to tell him to go back to work, and that he entered her bedroom and shot her. She pretended to be dead while she watched Defendant take her belongings and leave the apartment. Ms. Graves identified Defendant as the person who shot her to her neighbor whose apartment she ran to for help. She also identified Defendant to Officer Brisco. Based on this evidence, we conclude that the trial court's admission of Defendant's statement into evidence, even if error, was harmless beyond a reasonable doubt.

***Suppression of Defendant's gun***

Defendant asserts that the firearm recovered by police as a result of information gained from Defendant's statement about the gun's location should also have been suppressed. The State asserts that Defendant has waived consideration of this issue by failing to seek suppression of the gun prior to trial and by failing to include the issue in his motion for new trial.

Defendant acknowledges that he did not explicitly reference the gun in his motion to suppress and asserts that the motion "was broad enough to capture both the pre-trial statement and the physical evidence that was recovered as a result of that statement." Nowhere in the four-page motion to suppress did Defendant mention the gun that was recovered by police. In his reply brief, he states that "the analysis of both issues is substantially the same." Curiously, Defendant asserts that "had the weapon not been included as a subject of the suppression motion, the motion, if successful, would have essentially no effect." To argue that the motion to suppress, if granted, would have had "essentially no effect" if the gun were not a subject of the motion undermines any argument by Defendant that his statement, in which he admitted that he shot and stole from Ms. Graves, had any impact on the jury's determination of guilt.

Nevertheless, despite Defendant's failure to include the gun in his motion to suppress or his motion for new trial and despite Defendant's failure to request plain error review or present any argument as to the five factors necessary for plain error relief, [2] we conclude that Defendant is not entitled to relief on this issue because Defendant's statement was not obtained in violation of his constitutional rights.

Non-testimonial evidence discovered as a result of a statement elicited in violation of *Miranda* must be suppressed "only when the statements are the product of an actual violation of the privilege against self-incrimination, i.e., such as when actual coercion in obtaining the statement is involved or when the invocation of the right to remain silent or to have counsel present is not 'scrupulously honored.'" *Climer*, 400 S.W.3d at 567 (quoting State v. *Walton*, 41 S.W.3d 75, 92 (Tenn. 2001)). While the gun is non-testimonial evidence, we have already determined that Defendant did not unequivocally and unambiguously invoke his right to counsel or his right to remain silent. Therefore,

---

[2] When conducting plain error review, this Court will grant relief only when the following five prerequisites are satisfied: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Gomez*, 239 S.W.3d 733, 737 (Tenn. 2007) (internal citations and quotation marks omitted). The defendant bears the burden of persuading an appellate court that plain error exists. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

under *Walton*, the exclusionary rule would not extend to the gun. Defendant is not entitled to relief on this issue.

### *Flight Instruction*

Defendant asserts that the trial court erred by giving a jury instruction on flight because he contends that the evidence did not support the instruction. The State responds that there was ample evidence from which the jury could have inferred that Defendant hid out or evaded police to support the instruction. We agree with the State.

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011). "Challenges to jury instructions present mixed questions of law and fact; therefore, we review challenged instructions de novo without a presumption of correctness." *State v. Smith*, 492 S.W.3d 224, 245 (Tenn. 2016).

Flight or attempted flight may bear on the defendant's intent, purpose, or consciousness of guilt and may connect the accused with the commission of the offense. *Rogers v. State*, 455 S.W.2d 182, 186 (Tenn. Crim. App. 1970). When the jury is presented with evidence of flight, it may draw an inference of guilt after considering the circumstances of flight in the absence of an explanation of the "'reasons or motive'" for the flight. *Id*. at 186-87 (quoting 22A C.J.S. Criminal Law § 625). Flight requires both a leaving of the scene and a subsequent act indicative of an intent to flee:

> "The law makes no precise distinction as to the manner or method of [a] flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight."

*Dorantes*, 331 S.W.3d at 388 n.16 (quoting *Rogers*, 455 S.W.2d at 187). "Evidence of flight to avoid arrest may be rebutted by a credible explanation of some motive other than guilt, but the conclusion to be drawn from such evidence is for the jury upon proper instructions from the trial court." *Hall v. State*, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979). In order for the flight instruction to be warranted, sufficient evidence must exist to support the instruction. *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004) (appendix).

The trial court gave the following instruction on flight, over Defendant's objection:

Now the flight of a person accused of a crime is a circumstance which when considered with all the facts of the case may justify an inference of guilt. Flight is the involuntary withdrawal of one's self for the purpose of evading arrest or prosecution from the crime. Whether the evidence presented proves beyond a reasonable doubt that the Defendant fled is a question for your determination. The law presumes – the law makes no precise distinction as to the manner or method of flight. It may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, the evasion or concealment in the community or in leaving of the community for parts unknown to constitute flight. If flight is proved, the fact of flight alone does not allow you to find that the Defendant is guilty of the crime. However, since flight by a Defendant may be caused by a consciousness of guilt, you may consider the fact of flight if flight is so proven, together with all the other evidence when you decide the guilt or innocence of the Defendant. On the other hand, an entirely innocent person may take flight, and such flight may be explained by proof offered or by the facts and circumstances of the case. Whether there was flight by the Defendant, the reason for it and the weight to be given to it are questions for you to determine.

Ladies and gentlemen, the court has charged you concerning an inference that the jury may make, this is with reference to flight, in regard to certain evidence. However, the jury is not required to make this inference. It is the exclusive province of the jury to determine whether the facts and circumstances shown by all the evidence in the case warrant the inference which the law permits the jury to draw. The inference may be rebutted by direct or circumstantial evidence or both, whether it exists in the evidence of the State or is offered by the Defendant, although the Defendant is not required to rebut the inference raised, you should consider such explanation along with all the evidence to determine not only the correctness of the inference but also the reasonableness of the Defendant's explanation. You're not bound to accept either the inference or the Defendant's explanation. The State must prove beyond a reasonable doubt every element of an offense before the Defendant can be found guilty.

We conclude that the evidence at trial was sufficient to support the flight instruction in this case. Defendant argues that he turned himself in to police on the day his arrest warrant was issued. The fact that Defendant turned himself in two days after the offenses did not preclude the jury from determining that Defendant attempted to evade detection

and conceal himself between the time when he left Ms. Graves' apartment and when he turned himself in.

Although Defendant contends that the evidence does not support that he hid out after he left the scene, the facts presented at trial could support the conclusion that the Defendant was hiding out. The State points to Defendant's statement to Sergeant Donald as evidence that Defendant hid out after the shooting. Defendant stated that he was scared after he shot Ms. Graves, and, believing that she was dead, he went to a cemetery in Humboldt where his mother was buried. At the cemetery, Defendant got rid of his gun and the items he stole from Ms. Graves after the shooting. Defendant also told Sergeant Donald that he lay in the bushes all day with a gun to his head two days before he turned himself in to police.

We have already concluded that Defendant's statement was not erroneously admitted. This evidence was sufficient to support an instruction on flight. Moreover, outside of Defendant's statement, there was sufficient evidence of a hurried departure from the crime scene and a subsequent evasion to warrant the instruction on flight. Finally, the instructions properly informed the jury that whether the Defendant fled was a question solely for their decision, that they need not infer flight, and that flight alone was insufficient to prove guilt. Defendant is not entitled to relief on this issue.

### *Double Jeopardy*

Defendant contends that his convictions for attempted first degree murder and aggravated assault violate principles of double jeopardy and should be merged. The State argues that Defendant has waived consideration of the issue because he failed to include it in his motion for new trial.

Rule 3(e) of the Tennessee Rules of Appellate Procedure provides:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn.1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial).

- 16 -

Although Defendant has not requested plain error review and has failed to present any argument as to the plain error factors, even in his reply brief, we conclude that Defendant cannot establish that a clear and unequivocal rule of law has been breached.  In order to prevail under the plain error doctrine, five factors must be present: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.  *State v. Gomez*, 239 S.W.3d at 737.

"It is well settled in Tennessee that, under certain circumstances, two convictions or dual guilty verdicts must merge into a single conviction to avoid double jeopardy implications."  *State v. Berry*, 503 S.W.3d 360, 362 (Tenn. 2015) (order).  "Whether multiple convictions violate double jeopardy is a mixed question of law and fact that we review de novo with no presumption of correctness."  *State v. Smith*, 436 S.W.3d 751, 766 (Tenn. 2014).

The right against double jeopardy ensures "[t]hat no person shall, for the same offense, be twice put in jeopardy of life or limb."  Tenn. Const. art. I, § 10.  In other words, the prohibition against double jeopardy protects criminal defendants from "multiple punishments for the same offense."  *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).  Our supreme court has observed "in single prosecutions, 'multiple punishment' challenges ordinarily fall into one of two categories: unit-of-prosecution claims and multiple description claims."  *State v. Allison*, 618 S.W.3d 24, 43 (Tenn. 2021) (citing *Watkins*, 362 S.W.3d at 543).  This case presents a multiple description claim, which arises when a defendant has been convicted of violating two different statutes.

In *State v. Watkins*, our supreme court adopted the two-pronged *Blockburger* test for multiple description claims.  *Watkins*, 362 S.W.3d 530, 556 (Tenn. 2012).  "The first step of the *Blockburger* test is the threshold question of whether the convictions arise from the same act or transaction."  *Id*.

> If the threshold is surpassed, meaning the convictions arise from the same act or transaction, the second step of the *Blockburger* test requires courts to examine the statutory elements of the offenses.  If the elements of the offenses are the same, or one offense is a lesser included of the other, then we will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy.  However, if each offense includes an element that the other does not, the statutes do not define the "same offense" for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments.

*Id*. at 557.

Pursuant to *Blockburger*, as adopted in *Watkins*, the threshold inquiry is satisfied in this case. Clearly, Defendant's convictions arose from the same act or transgression. *See Watkins*, 362 S.W.3d at 545. We must next determine whether the legislature intended to prevent or to preclude dual convictions. When the legislature has not clearly expressed its intent, we must examine the elements of each conviction offense. We "make[] this determination by examining statutory elements of the offenses in the abstract, rather than the particular facts of the case." *State v. Cross*, 362 S.W.3d 512, 520 (Tenn. 2012).

In his two-paragraph argument on the issue, Defendant relies on cases that applied the four-part analysis established in *State v. Denton*, 938 S.W.2d 373 (Tenn. 1996). However, in *Watkins*, our supreme court specifically abandoned the *Denton* analysis in favor of the *Blockburger* same elements test. *Watkins*, 362 S.W.3d at 556. In abrogating the *Denton* analysis, the *Watkins* court rejected the "same evidence" analysis relied upon in the cases cited by Defendant. *Id*. at 552-553 (stating that analysis of the evidence used to prove the offenses was ineffective in ascertaining legislative intent, the key consideration in multiple punishment cases).

Applying the *Blockburger* same elements test, the State asserts that each offense includes an element that the other does not. Specifically, the State argues that attempted first degree murder requires that a defendant intended to kill the victim, whereas aggravated assault does not, and that aggravated assault requires that a defendant caused bodily injury to the victim, whereas attempted first degree murder does not.

As charged in the indictment, first degree murder is a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Criminal attempt occurs when a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3). As charged in the indictment, aggravated assault requires proof that Defendant intentionally or knowingly caused bodily injury to the victim by the use of a deadly weapon. T.C.A. §§ 39-13-101(a)(1), -102(a)(1)(a)(iii).

Appellate courts of this state have consistently held that aggravated assault is not a lesser-included offense of attempted first degree murder because each contains an element that the other does not. *Demonbreun v. Bell*, 226 S.W.3d 321, 324 (Tenn. 2007); *State v. Bobby J. Hughes*, No. W1999-00360-CCA-R3-CD, 2001 WL 91736, at *14 (Tenn. Crim. App. Jan. 26, 2001), *no perm. app. filed*; *State v. Christopher Todd Brown*, No. M1999-00691-CCA-R3-CD, 2000 WL 262936, at *2 (Tenn. Crim. App. Mar. 9, 2000) (holding

that assault and aggravated assault are not lesser included offenses of attempted first degree murder under the *Burns* analysis because the statutory elements of assault and aggravated assault are not included in the statutory elements of attempted first degree murder), *perm. app. denied* (Tenn. Sept. 10, 2001).

Based on our analysis of the statutory elements of the offenses of aggravated assault and attempted first degree murder, we conclude that the legislature intended to permit multiple convictions and that multiple convictions do not violate double jeopardy. Consequently, no clear and unequivocal rule of law was breached and the trial court's failure to merge Defendant's convictions in counts 1 and 2 was not plain error. Defendant is not entitled to relief on this issue.

## CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE